Alright The United States Court of Appeals is now in session. Good afternoon and welcome everyone to the Browning Courthouse here in San Francisco. This is the time set for oral argument in the case of the State of Daniel Hernandez v. City of Los Angeles. The lawyers are ready to proceed. You may come forward. Good afternoon. May it please the Court, my name is Erwin Chemerinsky and I represent the estate of Daniel Hernandez. I'd like to save three of my 15 minutes for rebuttal. This case presents the Court the opportunity to resolve an enormously important issue. What should be the legal standard for determining whether a right is established with sufficient particularity so as to be clearly established law that a reasonable officer should know? One second please. The clock's not on. Over here. It's not on the podium either. Sorry. Sorry to interrupt you, but let's just pause for just a minute.  The clock is on now. Got it. I think we're ready to resume. Thank you. We'll repeat that sentence. This case presents the Court the opportunity to resolve an important legal issue. What is the legal standard for determining the level of particularity in which a right must be established in order to be clearly established law that a reasonable officer should know? I'd urge this Court to adopt a straightforward approach based on Supreme Court and Ninth Circuit precedent. The question should be, is there a meaningful factual difference between this case and precedent so that a reasonable officer would have doubt as to the constitutional rule? Under both Supreme Court and Ninth Circuit precedent, it's clear that when an individual has been shot by police officers and is on the ground, the officers can continue to shoot only if there's an immediate danger to the officers or bystanders or risk of fleeing. Let me push back on that because I was interested in how you phrased the question. It seems to me the question really comes down to notice. Would you agree with that? Does an officer have notice in that situation that what he's doing is right or wrong under the law? Your Honor, I think you and I were saying the same thing. I'm articulating it as a legal standard. Is there a meaningful factual difference between this case and precedent? But the problem that I have with where you're going with that is you're sort of asking these officers then to become lawyers and figure out what the general – they read the Zion case and, therefore, they should know how to act in every other case. And the facts come up differently. They're making split-second decisions. Of course, but this court has been clear in Zion and other cases that if a suspect has been shot and on the ground, the police can continue to shoot only if there's an immediate threat to the officer or to bystanders or to flee. That's exactly what Zion said at 874 F 3rd 1076. And, Your Honor, this case is factually indistinguishable from Zion. But wait a minute. In Zion, there was the first volley of shots, of nine shots. Then the officer ran some distance over to the suspect and shot again, another round of shots, and then walked around in a circle and then stomped on the person, right? So there were three distinct things that happened, and there were breaks and time periods in between. It seemed to me reading Zion that this case was like the first volley. There were six shots in six seconds. There was no long break. The officer didn't walk around. She didn't run closer to the suspect. It was six shots in rapid succession. Your Honor, I disagree with that characterization. There were two shots, and then Hernandez was on the ground. He had been shot twice in the stomach. He was 40 to 44 feet away from the officer. He attempted to put his hand on the ground and his knee on the ground to get up. Rather than wait to see if he could get up or if he was any threat at all, the officer shot him two more times. At this point, he was on the ground, and at most he was trying to roll over. He was writhing. Rather than wait and see, as this Court's precedent made clear, as the Supreme Court precedent made clear, that he was any immediate threat, the officer in one second shot again. And this Court has commanded in that situation that the officer has to make sure that there continues to be an immediate threat. Sorry, excessive force question. Is it just the fifth and sixth shots that you're challenging, or is it the third and fourth? Which is it? I would say the third and the fourth, and certainly the fifth and the sixth because of the sixth shot that was fatal. Once he was down on the ground, having been shot twice in the abdomen, before continuing to shoot, the officer was required, under the law from the Supreme Court and this Court, to see if he continued to be an immediate threat. In fact, in Zion, the Court said he had to be easily able to hurt others. Can I ask you, even under your own standard about materially distinguishable, what do we make of Zion's discussion? There's a whole paragraph about whether or not there was evidence in the case of him trying to get up. And the Court said that that argument of the defense, that that made a difference, failed because there was no signs of him getting up. So it failed on the facts. But here there is evidence that even with respect, certainly with respect to the third and fourth shots, and arguably with respect to the fifth and sixth, that he was trying to get up and that he was moving. Why doesn't that materially distinguish Zion under your own standard? First, in Zion, on page 1075, the Court said that there's indication he might have been trying to get up. Second, what was going on here should have been a question of fact for the jury. The question isn't, was he, when he was 40 to 44 feet away from the officer, trying to get up? The question is, if he got up, would he pose an immediate threat to the officers or bystanders were to flee? Having been shot two times, as I said to Justice Thomas, let alone four times for the last two shots, the officer had the obligation under the decisions of this Court and the Supreme Court to see whether he really could get up and whether he was a threat. And that's what makes this case indistinguishable from Zion. The other thing, Your Honor, that the panel said in distinguishing Zion is that here, Hernandez didn't put down the box cutter when he was told to do so. First, that's a factual dispute, too. If you look at excerpt of record, volume two, page 172, you have a witness who said after the third shot, he did try to put down his weapon. We look at the video, and the video is pretty clear that he had the box cutter in his hands even after he was deceased. Your Honor. I don't think you can go to a statement by a witness that is contradicted by the video evidence, can you? I think it's interesting, Scott versus Harris, what is the role of the video versus the witness. But let me set that aside entirely. The question still is not does he have the box cutter in his hand. The question is, given that he's 40 to 44 feet away from the police officer, and by the time the fifth shot, he's been shot four times, twice in the abdomen and the thigh and the shoulder. Is he an immediate threat to the officer or others? The concern I have with this immediate threat law that you want us to adopt is that almost seems like it is too high of a level of generality. Because how does an officer, you're still back to the same question, how does the officer have notice whether he's an immediate threat? He says, I felt threatened, but you have to find something in the case law that says it. Your Honor, I think you're confusing the question of law with the question of fact. The question of law is, and it's a clear legal standard articulated by this court, is it an immediate threat? Then you have the question of fact in that here this should have gone to the jury to determine. It shouldn't have been determined on qualified immunity by the court. But that's what you're asking us to do, is say that any time there's a question about whether the threat was immediate or not, that should always go to the jury. And that would have the reverse effect that you're arguing. You're saying don't do it with such specificity, but then you're asking us to send all of these cases where there's a potential immediate threat to the jury. Not at all, Your Honor. You have to look at the specifics of the case, and you have to also see is there a meaningful factual difference in precedent. Okay. I agree with that, but that's not what you were arguing before. You were saying any time there's a – just to be clear, you're not asking us then to adopt a rule of law that says as long as there's a question of fact as to an immediate threat, that should always go to a jury. I didn't say that, Your Honor. Okay. I want to – if you're not saying that, then that helps clarify what you're looking at. Of course. In any instance, it has to be decided whether or not it's a triable issue that affects the jury. I'm saying in the facts of this case, one, Zion and other precedents have said when a suspect has been shot on the ground, and let's say here twice or four times, you have to determine whether it's an immediate threat. You focused in your questions on the notice to the officers. The Supreme Court in Plummouth v. Rickard a decade ago, this court in Zion has always said that's the standard. And if the question is in this situation, was he an immediate threat to the officer or to others that have fleed, that's the question given these facts that have gone to the jury. One question, Mr. Chemerinsky, that arises from this discussion is if we agree that the first and second shots were justified by an immediate threat, is it a reasonable rule to expect the officer in this situation to cease what she's doing? Because I appreciate the argument you're making, but I also can think on the other side that this would be a difficult thing to stop if you're in the middle of a high-pressure situation like this. But this court has commanded in many cases that it's exactly what the officer should do. After the first shot, shouldn't keep shooting, but wait and see. I'd refer to this court. Part of the problem I'm having with the way you're describing the facts is it seems to involve second guessing what we've been told not to do. And your brief or the estate's brief included still photos. But the officer, of course, couldn't see in still photos or free frame or slow motion or rewind and watch multiple, multiple times. And I've watched those videos multiple, multiple times. And to parse it out the way that you do with volleys, separate volleys, that doesn't happen when you just watch it in real time the first time through, which is what the officer saw. So how is that permissible? Why should we be putting the officer in that position? If I take your approach to what Judge Grass said, then once an officer starts shooting, the officer can keep shooting until the person is dead. And that's not what this court has said. What this court has said and said repeatedly is once somebody has been shot and on the ground, there can only continue to be shots if there's reason to believe there's an immediate threat. But you're looking at all of this after the fact and slowing and stopping the video and taking still photos and making this analysis that the officer couldn't make at the time. We're talking about six seconds. It's six seconds from the first shot to the last shot. But, Your Honor, that cuts exactly the other way. It shouldn't have been six seconds. The officer after the first two shots should have seen whether he could get up and whether he was an immediate threat. The officer didn't do that. And the video clearly shows him getting up after the fourth shot. Well, what it shows is he's putting his hand on the ground and his knee as if he's about to get up. Whether he could actually stand up with the two abdomen wounds and whether he could go 40 to 44 feet, the officer should have at least waited to see could he get up. But even if I can see that, after the fourth shot, he is down on the ground, and at most, he may be trying to roll over or is writhing in pain. At that stage, what happens is the officer doesn't what the officer should have done, wait and see whether he'd get up. What the officer does is wait one second and fire two more shots. And this court and the Supreme Court have made clear when somebody is incapacitated, it's the officer's duty to not keep shooting. That's what the court said in Plum Officer's Record. That's what this court has said. Would you be making the same argument if he had a gun or would you be saying in that case what the officer did was justified? Well, I think if he had a gun, it would be a very different situation because somebody from 40 feet could fire a gun. Somebody from 40 to 44 feet who's down on the ground, having been shot, depending on what you're talking about, two or four times with a box cutter is not any threat unless he can get up. That's what I'm trying to understand is whether – because sometimes you're phrasing the rule in a way that seems a little bit broader, but it seems that the rule may actually hinge on some of the factual features of this case like the box cutter as opposed to a gun and perhaps the distance. Of course it turns on the factual features, and I completely agree with that. But I'm also not articulating a new standard. I'm taking exactly word for word what this court has said in Zion on page 1076, and I'm saying given the facts here, this is something that should have gone to the jury. I want to save the remaining time for rebuttal if that's permissible. Can I ask one question clarifying?  Are you – you said you're representing the estate. That's correct. Are you also representing the parents? The parents, yes. It is the parents. And maybe you can address this in the rebuttal, but as to the – there's also a 14th Amendment claim here. There is a 14th Amendment claim. I would be interested because we have said, at least at the three-judge panel level, that parents have a 14th Amendment right to the companionship of their adult children. We are an outlier. We've never done any analysis of that. If we wanted to get in accord with other circuits and reject that on that basis, would we have to ask for supplemental briefing here? That particular issue was not briefed in this case. There was briefing in terms of whether the due process standard under Porter has been met. But I'd be glad to address both questions if you'd like.   Good afternoon, Your Honors. Noreen Mukherjee on behalf of the plaintiff, MLH Minor. I will reserve two minutes for rebuttal. It seems to me there are two broad issues for this panel. Did the law existing at the time of this shooting clearly establish the unconstitutionality of Officer McBride's conduct, continuing to shoot at a wounded suspect on the ground when he no longer poses an imminent threat to the officer or the bystanders? Is that issue still debatable in our country, within our circuit, within the Supreme Court authorities? Second, public policy ramifications of this doctrine. Are federal courts going to become a relic of the past in enforcing federally protected rights? Because the current trends in the application of this doctrine have wiped out Section 1983, have turned away litigants from federal courts to the vagaries of the state courts. In 1865, after the assassination of President Lincoln, Ulysses S. Grant wrote to his wife, Julia, I have a Herculean task to perform, and I shall endeavor to do it not to please anyone, but for the interests of our great country that is now beginning to loom far above all other countries, modern or ancient. Right now, President Grant would be turning in his grave if he saw what has happened to the Civil Rights Act of 1871 that he signed into law to fight, to bring forth this country together. And I think that it's time for us to revisit that doctrine that has authority to change the Supreme Court's case law on qualified immunity. So I understand, you know, we have an amicus brief that suggests that that should be overhauled, but you agree we lack the authority to do that. Your Honor, if you're sitting on bunk, the most influential circuit can at the very least look at the underpinnings of this doctrine, historical, and invite the Supreme Court to revisit it. I understand that's not the immediate issue before this Court, but I do believe that Pearson v. Ray, Harlow v. Fitzgerald are misapplication, misapprehension. It's a travesty of 1983 statute. Well, bringing it back to the case at hand, it seems like what we have to decide, and what I'd like to hear from you, would you agree that what we're really looking at for qualified immunity is whether Zion clearly establishes a law that the officer should have understood here? Absolutely, because if you—I read the panel's opinion very carefully. If the panel has admitted there were separate three volleys of fire, and the panel admitted that the last two shots, five or six shots, could be found unreasonable by the jury, then— No, but that is a false argument, because clearly you can have cases where there's a constitutional violation, but you still get qualified immunity. So I don't think you can point to the panel's opinion and say, just because they found a tribal issue on the constitutional violation, that answers the qualified immunity question. No, that's not where I was going, Your Honor. What I was saying is that Zion controls for those reasons, because Zion has separate volleys of fire. But my question is, as to qualified immunity, you're saying— Yes, because if we have—look, the defendants are pointing to Plumov, and the court has looked at Plumov versus Rickard, saying this is more similar to this case before us than Zion. That's not true, because Plumov—let's look at Plumov very carefully. Plumov involved a high-speed chase of a fleeing suspect that endangered the public at large. There were no separate rounds of fires, and the court there stated this would be a different case on page 2022 if petitioners had initiated a second round of shots after an initial round had clearly incapacitated Rickard and had ended any threat of continued flight, or if Rickard had clearly given himself up. Look, Daniel Hernandez, if you look at the forensics analysis of how Daniel Hernandez went down to the ground, first two shots, he's already shot. Third, fourth shots, he's crouching on his arms. Fourth shot, he's on his buttocks. He's on his buttocks on the ground. Three, four, six shots, he's prone. So in response to the question by Your Honor that this is—he's moving, he's got a box cutter in his hands, but that's not the standard for purposes of deadly force, because if you look at case after case, Hayes versus County of San Diego, Diorley, George versus Morris, 10 Lamb versus City of Los Banos, all those cases have said for purposes of deadly force, being armed does not mean that you are holding a weapon that is potentially dangerous. No. Being armed means being an imminent threat. But, Counsel, in Plumas, they didn't analyze the shot-by-shot, frame-by-frame that you're doing. The way they did it is that they said that there's two shots that were fired. Then he tried to escape by vehicle, and then there was another, I think, 12 shots after that. They never did this frame-by-frame, shot-by-shot analysis that you're asking us to do. Where are you getting that from? Well, because that didn't involve their facts, Your Honor. They had 15 shots in Plumas and Ricard, Mr. Ricard. Exactly. Doesn't that hurt you that there's 15 shots here, there, and they just group them into two big groupings? And so you're asking us to take six shots in six seconds and do it frame-by-frame, which I've just never seen before. Well, no, Zion. Look at Zion. But what happened in Zion, so what we know from the opinion is that there were nine shots initially. Yes. Then there was a break, the officer approached the suspect, and then there were more shots. How quickly were the first nine shots? Were they in nine seconds, 15 seconds? When did the suspect go to the ground? There's no analysis of that. But there was a clear break, a clear opportunity for the officer to stop and reassess, which seems factually different from what happened here. No, I don't think it's factually different for the following reasons. The main arguments that are drawn here, the whole point of this is imminency of the threat, right? Why are we looking at this so esoterically? This is all about the imminency of the threat. Would a reasonable police officer be on notice that if the threat stops, you need to stop shooting? Do you agree on the first two shots? Do you agree that that presented an immediate threat when there was the first confrontation? Well, I would agree with the court's analysis in that respect. A reasonable police officer might have perceived as a threat, even though a jury might have thought differently. Remember. But, I mean, I think if it's acknowledged that at the beginning of this interaction, the officer had the ability to shoot, and including the shoot to kill, we have to then ask what is the significance of what happened in the next four seconds of this? Because by the logic of this, the officer could have quickly fired six shots, and the result would have been the same, and we wouldn't be here debating second by second some of these interactions. No, but because, Your Honor, you need to study the shots. There was a pause between the first and second and third volley of shots. There was a pause, and the officer is taught where I was going earlier. It happened during those pauses. I mean, there were second-long pauses, right, or micro-second-long pauses. Yes, but, sir, Your Honor, the whole issue is this. The Board of Police Commissioners, first of all, the policy. Let's look at the policies. Training and policy. Just look at all the prior precedent. There's discrete events that happened in between those pauses, and they're not these second-long seconds that you're talking about here. Okay, but what is the problem there? Zion says, look, if the threat is halted between the shots, a reasonable police officer needs to recess the threat, and their policy teaches that. We have Zion, County of Orange. We have their policy says that. The board independently studied and said, no, this is violation of our policy. So what is the problem here? Why are we having a problem of thinking about qualified immunity? Well, because a board policy does not control qualified immunity. It may control state law claims, and the panel said, and I would tend to agree that those state law claims should go forward. But the board policy does not control qualified immunity. It does not, but, Your Honor, it puts an officer on notice. If you were asking about an officer being on notice, right, a reasonable police officer is on notice that a threat must be imminent for deadly force, and if the threat is halted, she needs to stop. Just to be clear, there's a difference between being on notice that you violated policy and being on notice that you violated the Constitution. Those are two separate questions. We're well aware of that, Your Honor, but if Zion does not look, if Zion does not control, what else is going to control? So next case comes along. Let me tell you what will happen next. After Daniel Hernandez's case is closed, we will have another case. We'll come forward, and the judges will say, oh, no, we don't have a factually identical case. Therefore, qualified immunity applies. No, but that's not the standard that we've had. Look at all these cases. I don't think that's a fair rendition of what the panel did here. They didn't ask for a factually identical case. We're having a debate about how close it has to be. I don't think anybody's asking for factual, I mean, exact similarity. But, Your Honor, let me tell you something. If at MSJ judges sitting at motion for summary judgment are going to do this granular molecular type of analysis of qualified immunity and they are going to grant it on the basis of such molecular view of the facts, isn't that a violation of the right to jury trial? The issue, whether Hernandez was a threat, imminent threat, at the fee for six shots, was a question for the jury, Your Honor, not for the judges. Now you're stepping into the same problem that I was giving your co-counsel a problem with because I think you have to be careful about saying imminent threat is the touch point because there's always going to be a jury question about whether it's imminent threat. So we can't just say, oh, well, there's a jury question on whether it's imminent threat, so you have to go to the jury. No, but we have analogous. If you look at Kissela v. Hughes, let's go to Kissela v. Hughes, which is the controlling authority after Zion, and we have there the judges said, look, okay, we don't need you to provide factually identical case only to show that there is consensus in the governing authority. Let me ask you this, Your Honor. Isn't there any consensus? Counsel, can I ask a question? If we agreed with the district court that there was no constitutional violation, that it's step one, that there was no violation, should we still remand on the State law claims? Because there is case law saying that California State law is a broader protection than the Fourth Amendment, and the district court did not do a separate analysis between the constitutional analysis and the State law analysis. I am not concerned about that, Your Honor, right now. I'm just not understanding your question because if you think that the panel got it wrong in terms of the— No, I'm saying if we think that the district court got it right on the constitutional question, then what should we—does that mean that we need to affirm on the State law question or should we still remand because there's a distinction, there's a delta between the Fourth Amendment right and the California right? Yes, we understand that, but we didn't touch upon that in our unbound briefing, and I'm more concerned about the fact that Zion is basically de facto being overruled by this panel's decision, and if you look at the case of Pan Lam v. City of Los Banos, it's a very good analysis that specifically confirms that Zion— and that came after Kissela v. Hughes, that came after our case even. It came in 2020, and I think that is a very instructive analysis, confirms that you look at the fires separately. At this point in time, it was pretty factually distinguishable because the officer had shot the suspect who, if I recall correctly, was armed with scissors and may have already stabbed somebody with the scissors, maybe even the officer. I think he actually stabbed the officer. Then the officer's gun jammed, and he retreated and had time to clear the jam, so there was a very long break, and then he shot the suspect later, and at that point the situation had subsided and the danger was no longer present. That's entirely different from what happened here. Your Honor, if you look at it, our facts are even more favorable. My client was never seen stabbing anyone. Connor Zion stabbed three people. Pan Lam, Sonny— But then the relevant point is that there were distinct breaks in what happened in Zion and in what happened in Lam, but there wasn't here. I mean, you say that there was if we free-frame and take still photos and review the video in slow motion over and over again, we can say it was not one set of shots. No, the point is this. The point of those cases, both Zion and Pan Lam v. City of Los Banos, is the following. If the suspect is incapacitated, is on the ground, whether he's moving, whether he's holding something that can be a potentially dangerous weapon, judges have rejected that. They've said, for our purposes, for this, there is clearly established law that when there is suspect that initially is a threat. Initially, I'll give you that. Initially, deadly force is justified. Yes, he's armed. That's a potential danger. You incapacitate. You stop that threat. But once that threat is halted, the whole point is that the officer is on notice that she cannot continue. You do not terminate the suspect. You terminate the threat. And so this officer, what she did do wrong was that after this man had his buttocks on the ground, he was kneeling, he was wounded, he was struck by the bullets, he was screaming from pain. She is a trained officer. A reasonable police officer would have stopped, not continued shooting. And that is the key component of the facts of the holdings of time versus county margin. Thank you very much, Counsel. Chief Justice Smergia, Honorable Judges, may it please the Court. My name is Kevin Gilbert. I represent the defendants and the appellees in this matter. This matter comes to the Court following the trial court granting summary judgment, finding that the use of lethal force was not only objectively reasonable, but also that the officer was entitled to qualified immunity. The three-judge panel then issued a decision, finding that shots five and six were too close to call. Counsel, we're well familiar with the procedural history of this case. Let me ask you this, and I'm going to read you a couple of sentences directly from Zion on page 1076. There we said, Terminating a threat doesn't necessarily mean terminating the suspect. If the suspect is on the ground and appears wounded, he may no longer pose a threat. A reasonable officer would reassess the situation rather than continue shooting. This is particularly true when the suspect wields a knife rather than a firearm. What more do we need to say than that to clearly establish or to put an officer on notice that if a suspect is on the ground and there's an opportunity to reflect a pause to not shoot to kill? Your Honor, thank you for raising that. Zion is not only factually distinguishable but legally distinguishable, and what we are asking the panel and what I think the proper inquiry should be is whether shots five and six were objectively reasonable, and there should be a new standard enunciated for the continued evaluation of lethal force, not the initial evaluation because that has already been addressed by the Supreme Court. The Supreme Court has already said where there's an imminent threat, you may fire, and as Plumhoff made clear, you may continue to do so until the threat has ended. Now, sitting in this courtroom. Sure, but I think I think of this as involving two separate inquiries that's before the en banc court. One is the scope of what's clearly established, and then second whether there are triable questions of material fact that would put this case before a jury. And so I'll just put that to you as two separate questions. One is the scope of what Zion clearly established, and I'm really struggling to understand why there's a distinction between Zion and this case in terms of the principle of law that's articulated. You shoot somebody, he falls on the ground, you're 40 feet away or 40-plus feet away in this particular case, he doesn't have a gun, and so the principle is pause, reflect, and see whether you can stop shooting at that point, right? And the second related but I think can be a distinct inquiry is whether the six seconds that it took to basically terminate the threat in your view, whether that even creates a triable question of fact for the jury. So I want you to take that up separately if you can. Of course. So what we would ask this panel to adopt is a standard that evaluates the continued use of lethal force and looks at two factors where continuous lethal force is employed. An officer may continue to use lethal force unless and until there is, one, a material change in the circumstances, and two, coupled with a reasonable opportunity for the officer to perceive that change. Turning to Zion, Zion had distinct breaks in the proceedings. The officer not only fired the first round but then paused, came up, fired a second round, then engaged again, and kicked the suspect. The opinion in Zion, as Judge Beatty noticed, doesn't say what the facts are, but if you go to the briefs, the defendant's brief in that case says that the length of time between the shots was only one second. The time between the supposed first volley and second volley was less than a second, the slightest of pauses at best. Here there were two seconds between the first volley and the second volley, and it was for one second. So this isn't distinguishable from Zion in that respect. And Zion analyzed those separately as separate volleys. Understood. But you are focusing on the defendant's arguments in Zion, not on the facts or the fact that the officer also came up and kicked. You said that there was, like, a difference in time here between this case and Zion, that Zion had more opportunity for reflection. In fact, it was a one-second space between the volleys, just like this one-second space between shots four and five here. So it's not materially distinguishable from Zion in terms of whether or not they were separate volleys. And my point was not the reflection. My point was during that time in Zion, the evidence and what the briefing shows is that the suspect was not making an effort to get up. Why isn't the question of whether the suspect posed a further threat? After having been shot, falling to the ground, he's moving. There's no question about that. But couldn't reasonable minds disagree on whether he poses a further threat? Well, again, we need to turn to the Supreme Court to its guidance on these issues, and that has been addressed in a trio of cases. First, Plumhoff addresses it. I think the threat's terminated. That's a question for the jury. You can argue that to the jury, that, well, he's moving around, he's attempting to get up, he's still holding the box cutter, and so, therefore, the threat has not ended. But the plaintiffs can also argue that the threat has ended. Look at the video. He's clearly severely wounded. He was moving very slowly, and so the officer didn't have to shoot the second, third, or at a minimum, they're entitled to argue the fourth and fifth shot. So how do you respond to that? Your Honor, the video undisputedly shows the suspect continuing to try and advance. The officer does not know how damaged or even if he's been shot. She knows he falls.  What do you mean by that? He's between shot two and three. He gets up and starts to get into a sprinter's stand before he's shot again. The officer does not know if he's been shot at any time. What about between shots three and four, five and six? There's still no evidence the officer knows. Your Honor knows that by taking the video and watching it time and again. Counsel, it looks like he's rolling around after having been shot four times. Wouldn't a reasonable jury determine that? Well, the question is not whether a reasonable jury would. The question is, based upon Plumhoff and Sheehan, would a reasonable officer understand that the threat had ended? In Sheehan, you'll recall the suspect was on the ground, shot, and yet despite being on the ground, the Supreme Court found the suspect. But he was rolling around after being shot four times with a box cutter. Where's the immediate threat? He's absolutely still a threat. He's still continuing to move forward. And it's not just the officer that's in threat. There's numerous people in closer proximity on either side of him on the sides of the street. This is an individual that the officer suspected he was under the influence of methamphetamine, knows he has a weapon, he's disregarded commands to drop the weapon or to comply, and he's continuing to advance. Based upon the Supreme Court's comments in Sheehan Why do you say that, that he was continuing to advance when he's rolling on the ground? I mean, again, we've all seen that video many, many times, unfortunately. And therein lies the problem, is as the Supreme Court has said, the officers need to be judged in real time, standing in the situation with a person coming towards them, armed, acting erratically, under the influence. When you watch it numerous times, you cap the luxury of sitting in safe chambers. None of us want to stand in front of somebody with a gun or face someone who's trying to kill us, but that is what officers do. And that is why Graham and numerous other cases, Graham is very specific, we must evaluate the situation based upon the information known to the officers and not with the vision of 2020. Counsel, are you suggesting that we should not look at videos of these incidents? No, Your Honor, that's not it at all. I think videos have their purpose, but they need to be used carefully and sparingly. But what do you mean by that? Should we watch it one time, two times, not slow it down, not speed? What do you mean by carefully and sparingly? So I struggle to give a specific rule of law because I don't think that you could adopt a rule of law that goes across all uses of force. I think that when a court evaluates the specific use of force, it needs to look at what was the officer's vantage point. What did they see? How did they evaluate the facts? And what Toni McBride saw in this situation was a man who continued to try and get up who was armed. She knew he had a knife. She didn't know if he had a gun or not. He had not been searched. So this is not a situation where she knows, obviously, he's on the ground, he's safe. And, in fact, she has specifically addressed that. Mr. Gilbert, a lot of this might be good closing argument, but we're asking what an officer would be on notice of. And you're talking about Sheehan. Your brief focuses on car chase places. It seems like you're making the same mistake the Supreme Court has assigned to us when we've attacked something at too general a level. We have a case, Zion, that says continued force against a suspect who has been brought to the ground can violate the Fourth Amendment. That is the case here. We said it was clearly established then at the time because we're citing cases that you can't sit on someone while they're down, you can't punch someone while they're down, you can't stop on someone's head while they're down. Why wouldn't an officer be on notice that you can't shoot someone twice when they're down? If there was clear evidence that the person was down and was no longer a threat. Right. I agree with that. But when we talk about the threat, so as we don't invade the province of the jury, some of that has to be a jury question about whether the person is actually down. In terms of whether they're a threat, once we fall back on the threat, and this is going to be my question for your friend as well, if we evaluate it simply at the threat level, I agree, that may not provide a reasonable officer sufficient notice. But we have a case, Zion, that not only clearly establishes a similar set of facts, but itself held, it's clearly established, you can't shoot a man when he's down, when they're not a threat. And the question of whether they're a threat, how far away they were, whether they had a knife, whether they were handling it, question for the jury in Zion, question for the jury in this case. But why isn't that enough notice for an officer? I don't believe Zion states that you can't shoot someone when they're down. I believe Zion holds the principle that you cannot shoot them when they're no longer a threat. It does not have such far broad-reaching scope as far as someone being down. If it did, Zion would be directly contrary to Sheehan, Plumhoff. It said in the portion I read to you that if he's on the ground and appears wounded, he may no longer pose a threat. And a reasonable officer would pause to assess the situation rather than continue shooting. That's pretty clear. And wouldn't that be true when the officer testified that she knew that her first four shots she aimed for and was shooting at center mass, the center mass of his body, and that she had shot him in the center mass of his body? No. You cannot make that assumption. The officer did not know whether he had been hit or not. She did aim at center mass. She did shoot. But there is no objective evidence for her to make that conclusion on. She still sees the person still rolling around, still getting up. And, in fact, as this court— Even by looking at the video? I mean, that's what we're looking at. You're saying that we can't make that determination at this point? Well, I'm sorry. I just question, and I just interjected on Judge Wynn's question, but I wanted to add that as an additional piece so you can go ahead and respond to Judge Wynn. We have four judges who have looked at this, our trial judge and three-judge panel. And the cumulative response is that even after shot four, the suspect, quote, continually moved in a way that gave the appearance of trying to get up. But you cite Sheehan, for example, and Costella, too, two cases that focuses our attention because they're both cases where the Supreme Court is overturning us. But in both those cases, there's someone within striking distance. Who's in striking distance of Mr. Hernandez's box cutter? Well, let's look at the factual situation. The totality from the time he rounded the back of the truck until the time the sixth shot was fired was nine seconds. And during that nine seconds, you have five and a half to six seconds of the six shots. He had closed half the distance in the three seconds before she fired. And she was backing up while he was doing that. He was continuing to advance. So you have an officer who's not only tactically redeploying, but you have a suspect that's closing that distance extremely quickly. That's not the question. That's not the issue, as I understand it, that the plaintiffs are presenting. We're talking about the third, fourth, fifth, six shots. Mr. Hernandez did not close any distance after the first couple of shots. But the third, fourth, after the second shot, he tried to. He rose up, got into a sprinter's stance before he was shot again. But the court is dividing the volleys into individual decisional moments. No court has ever done that. No decision has ever done that. In fact, the Monson decision seemed to group the shots together and suggest they should be as a volley. Plumhoff did the same thing and confirmed that you look at the use of force in the volley, and that's why we're advocating for a new policy. Why is that not clearly established with respect to you can shoot until the threat's terminated, but you have an obligation to assess? Why doesn't that include? I guess what's your response to your friend's argument that you're urging a rule that says you can shoot until the suspect is dead? That's not what we're advocating. We're advocating that you can shoot once lethal force is objectively reasonable, that an officer can continue to employ it unless and until there is a material change. And in this case, I use material because that is already robustly defined in case law for Rule 56 motions, a material change. He stops advancing, for example, coupled with a reasonable opportunity to perceive it. We're talking about split seconds here. And as numerous courts have found, for example, in Wilkinson v. Torres, the court went and said, we're not going to decide if two seconds is too quick to process and evaluate. The officer literally is splitting hairs. But Zion was within a short period of second time as well, wasn't it? Zion, you have an officer that's advancing on a suspect that is down, that is not moving, is making no effort to get up. That's not correct. I'm reading Zion. The suspect, Zion, was still moving at a certain point, and we held that there still might be a violation in that case. So it's just not correct that Zion was not moving at all at the point of the second round of shots. I'm sorry, Your Honor. I thought that the discussion in Zion focused on the fact that there's no evidence that the suspect posed a further threat. Defendants argue that Higgins' continued use of deadly force was reasonable because Zion was still moving. I'm reading from the decision. But it says a jury could nevertheless find that Zion no longer posed a danger. But if I'm not mistaken, forgive me, I don't have the facts memorized, but I thought that the moving was moving on the floor, not trying to get up, trying to advance, trying to do anything else. So moving on the floor is different than, in this case, a suspect that is literally getting up into a sprinter stance first time, second time. When you say getting up to a sprinter stance, that is your characterization. And I guess you've said that now a couple of times, and I want to make sure. I don't know that everybody or a jury would agree with that characterization, and that's kind of the question. That's why we're here, is that should that have gone to a jury? You're characterizing it as a sprinter stance. I did not see it as a sprinter stance, but I don't know if I'm right. But it seems like because there's a question there, why wouldn't we let this go to a jury? Because whatever the adjective is that's used to describe it, the video is very clear, and Scott is very clear about the priority of videos. It shows the suspect rising up to some level. So let me ask you this because I think we're now going in circles in terms of the perception of the facts. So I'm going to read you the way the three-judge panel described the fifth and sixth shot. As Hernandez started to shift his weight to his feet to stand up, McBride again yelled, drop it, and fired a second volley of two shots. Then he fell back on his back. And then it continues. Hernandez began to roll over onto his left side, and as he did this, McBride fired a fifth shot. Hernandez continued to roll over so that he was again facing McBride. His left knee was pressed against the ground, and he placed his left elbow on the street as if to push himself upwards. Do you dispute that? So I don't dispute it, but I add in the following, and this is at page 18 of the opinion, that Hernandez, quote, continually moved in a way that gave the appearance of trying to get up. That goes to the Plumhoff decision. Was Hernandez clearly incapacitated?  But you see, your argument, taken to its logical conclusion, means that any time a suspect is on the ground wounded but hasn't ceased his movements, then the officer can continue firing, right? I think such a blanket statement is overbroad and is not my argument. My argument is very specific. In this case, where you have a suspect that has already posed an imminent threat, has already disregarded numerous directions, as Officer McBride gave him directions to halt, drop the weapon, his only response was, you know I'm not going to do that. So in this case, after the fourth shot, so long as his body is still moving, the officer can continue shooting? No, I don't think it's simply because he's moving. I think that because he's continuing to hold the knife, he's continuing to be noncompliant, he's trying to, he appears to be getting up, and the officer's reasonable conclusion is that he could be continuing to advance. An officer does not need to wait and see the glint of steel as it comes into her. Well, at some point, though, that's got to become a question of fact for the jury, right? You're making an argument that the jury may very well accept, given the short duration of time, but I think the jury could easily see it the other way as well. So, Your Honor, I think that goes to the point of the Supreme Court in High End. In High End, the Supreme Court was very clear that to be reasonable is not to be perfect. So while in the serenity of this courtroom we may see facts differently and have the luxury of a video, the officer could not call timeout and say, hey, what are you doing? Are you still a threat? Instead, she had to make a life-and-death decision. But did she? That's the whole question. Did she at that point? Because was he charging her? Do you think that he was charging her? I think he was continuing to try and get up.  And do you think he was rapidly advancing toward her? After the fourth shot, no.  So it seems like our case law on this issue seems to focus on those kind of issues, those kind of facts. Even within a smaller distance, in the Hayes case, the person was 8 feet away, and it was in enclosed circumstances. He wasn't charging, so the court said they can evaluate and go forward to a jury for qualified immunity. So I'm just trying to draw the distinction here because here he wasn't charging. He wasn't rapidly advancing toward her. She knew she had shot four times at center mass. It seems from the video she saw that it hit him each time. I'm just struggling with why wouldn't that go to a jury to determine if it was reasonable? Because, first of all, you have to look at the facts as the officer viewed them with a suspect standing in front of her. And she's still trying to evaluate. In hindsight? In light of our law, we have to do that. And I know you keep talking about the luxury of the courtroom. What we do here is have to evaluate the facts in light of our law. And the law, we have cases that set forth that under these circumstances, it could be set to a jury, and it maybe should be set to a jury, and that's what we're trying to determine. That would be directly contrary to established precedent. For example, Judge Wynn's opinion in Isley v. Riverside, the suspect threw the gun away 2 to 4 seconds before he shot, and yet despite throwing the gun away beforehand, clearly he's not a threat at that point, it was still found that the officer was entitled to qualified immunity. There's countless decisions. Isovea, for example. And we look at the facts in each case, right? And we look at it in light of the law. And that's what we're trying to do here. Let me ask you, do you concede that no warning was given by the officer? No verbal warning was given, but there was an actual physical warning. The case is addressing warnings. What was the physical warning? Well, I want to know. When you say you agree there's no verbal warning, she didn't say, I'm going to shoot you if you don't stop, correct?  All right. And then go ahead, Judge Warholson. I said, what was the physical warning if there was no verbal warning? So the cases, the origination of the warning was for cases where officers, for example, snipers off in a distance where a suspect didn't realize they had a gun pointed at them, that they should be warned and have an opportunity to comply. Here, Officer McBride is standing there in a full uniform, getting out of a police vehicle with a gun trained on the suspect, giving him verbal commands, speaking to him. I thought you said there were no verbal commands. She's giving him verbal commands to stop, drop the knife, but not the verbal command of stop or I will shoot. Okay. What's your best case for the physical warning, for that to be a precedent here, for us to allow that to be a warning? So Harris v. Roderick is the case that discusses the sniper and is where it starts to develop it to make sure that there's notice to a suspect that there actually is, they're warned that they're about to be shot. Where an officer stands there and is giving directions and a suspect is advancing, first of all, it's not feasible to give a warning where you have things developing in a total of nine seconds from shot one to shot six. And that's from the time she sees the suspect. And then furthermore, even if— Well, she didn't give a warning from the very beginning. You're right. She didn't. She perceived that he was going to comply with her commands as he came out from around the vehicle. And was the crime at issue? How severe was the crime at issue? Depends on which crime you look at. The first one is driving under the influence of methamphetamine, causing a severe crash, causing severe bodily injury to multiple people. There's the attempt to advancing on an officer with a blade, or I think it's a Penal Code 417, I believe, is the actual statute. And those can be felonies. Okay. And then was he actively resisting arrest or fleeing? I would not say fleeing, but I would say actively resisting by refusing to comply.  Not arrest. No, you're wrong. Okay. But it would be a 148 violation. Can I ask about the state law? So the district court—  The district court said there was no constitutional violation, and because there was no constitutional violation, the state law claims failed. Yes. Do you agree that that is a misapplication of the law? No, sir. You think that if there's no constitutional violation, that there's no state law claims either? So that's a very broad statement. The Fourth Amendment—the analysis for the Fourth Amendment is coterminous with the analysis under state law. No, that's not true. The only difference is— No, that's not true. We've been very clear that it's much more robust under state law than the Fourth Amendment, especially in California. And that's what I was getting to. The difference is for the Hays application to look at tactics which can be considered— Yeah, but the district court didn't do that. The district court said because there was no Fourth Amendment violation, there's no state law violation. Because plaintiffs never advanced an argument that there was any tactical problems. Plaintiff's argument was focused on the use of lethal force, that the force itself. So since there was no argument at the trial court level or in the appellate briefs, that actually has been abandoned. There was no such claim advanced under state law that would trigger Hays and a different application. I see. So you're basically making a waiver argument that they didn't argue a distinction, and so therefore the district court was justified in misstating the law. I mean, the district court misstated the law. I don't— I mean, it cannot be the law that just because you don't have a constitutional violation that you don't have a state tort. That's not the test. It is if the claim is limited to— I understand your nuance. I understand the district court's ruling was that the parties agreed that on the facts of this case there was not a relevant difference between federal and California law. Is that a fair statement of how— That is a fair statement, and it also encompassed the fact that plaintiff had not pled or prosecuted a claim for violation of any California violations other than the ultimate use of force, and the ultimate question was simply was the use of force reasonable. Thank you. That's a helpful clarification. Counsel, the case you cited for the physical warning, is it Harris v. Roderick? I believe that's correct, Your Honor. Could you point me to the precise language in that case that talks about the components of a physical warning? Your Honor, I'm sorry, but the case does not specifically address a physical warning. What the case does is it encompasses and addresses why a warning is necessary, and it links back to Tennessee v. Garner and the principle of notice. I thought Judge McGeer asked you for the case that talked about the physical warning, and this is the case you cited to. You asked me for the best case, and unfortunately— But this is your best case. There is not a case that directly addresses the physical warning at this time. All right, thank you. What there is is one that talks about this is the principle as we see it and as we advance it. All right, but most of our warning cases where the warning is an issue is where something happens very, very quickly in the interaction, which is not really quite true here, given that there was time in which she was telling Mr. Hernandez that he needed to stop, drop the weapon. I'm paraphrasing, but there were interactions of that nature before the shooting. So this is a little different than a lot of the other warning cases we've had where something happens extremely quickly. Not necessarily, because the question is when did he become an imminent threat and when would a warning be given? When he rounds the back of the truck and starts walking towards her, he's not yet an imminent threat. Is he a threat? Absolutely. But until he's close to a sufficiently clear distance, at that point the officer believed he was only 15 feet away. Now, she misjudged the facts, and again, the Supreme Court has made clear that a mistake of fact is reasonable and can still give rise to objective reasonableness. But going to the second component, under qualified immunity, no case has ever articulated specific language or whether there needs to be a verbal versus some other warning. So officers are not on fair notice of what exactly should be done in these types of situations. And when we're talking about literally five and a half to six seconds from shot one to six, is one continuous folly where she's continuing to assess. There is simply no case that's ever said you have to give a warning two seconds before. I'm not necessarily disagreeing with you. What I'm saying is that the nature of her comments, given the context, are fairly viewed as in the nature of a warning. I'm sorry. I didn't hear the last part. It's quite all right. Can I ask about the 14th Amendment? Yes, sir. I guess you were relying on our case. We've said that there is a 14th Amendment claim potentially for a parent's companionship to their adult child. If we think that that should not be the law because every other circuit has rejected that principle, would this be the proper case to revisit that? And if so, I mean, it's a tough one because you didn't raise it before the panel because you were bound by prior circuit precedent. But we're not bound by that en en banc. Should we ask for supplemental briefing on that, or is that not an argument that you are interested in pursuing? So the problem is that plaintiff has waived the claim. It's not been advanced or prosecuted through a court of appeal. No, you would be raising the claim.  Plaintiff did advance the 14th Amendment claim. It seems like you'd be in the position to say you don't have one because you don't fit. I think this court would have discretion to make that decision. Should we ask for supplemental briefing on that? I think it would be within the court's discretion if it wanted to. But I think the court ultimately has the discretion to do as it sees fit on this. We would request that the court adopt a standard that confirms that the continued use of lethal force must take into account an officer's opportunity to perceive a change in circumstance and that the one second at most between shots, four and five, simply is not sufficient. We would ask that the trial court's decision be affirmed. Thank you. Thank you, Mr. Gilbert. There are three questions before this court, and then I'll address Judge Nelson's question. First, what is the standard for determining the particularity of which right has to be established? I think it's important that you say that the key question is, is there a meaningful factual difference between this case and precedent so that a reasonable law should be adopted in the constitutional world? Anything else risks turning qualified immunity to absolute immunity. Second, what is the precedent here? Judge Nguyen, you quoted from Zion. But Zion doesn't stand alone. Opposing counsel quotes Plumhoff v. Rickard, but he stops too soon. Plumhoff v. Rickard, 572, it's 777, says, this would be a different case if the petitioners had initiated a second round of shots after the first round. It clearly incapacitated Rickard. This court in Tavares v. City of Honey Beach says, when an officer is shot and somebody is incapacitated, the officer has the duty to reassess, not keep shooting. This court said the same thing in Tam v. City of Burroughs, 976 F. 3rd, 1002. The problem with Tavares, of course, is it wasn't a Fourth Amendment case. It was a California state case. I understand. But this court has made clear when somebody is down on the ground, you can't keep shooting. You have to reassess. So the fact that it was one second really cuts against the city because it shouldn't have been one second. The officer has seen whether there's a danger. And that leads to the third question, is there a meaningful, factual difference between this case and others? What opposing counsel keeps saying is that the individual tried to get up. Whether he was trying to get up is really a factual question that's gone to the jury. But the fact that he even tried to get up doesn't mean that he put anybody, not the officer, anybody else in danger. And therefore, under this decision, of course, decisions like in Sanderlin v. Dwyer and others, these should have been questions for the jury to resolve. Judge Nelson, no one at any point in this litigation asked this court to reconsider its precedent that says that parents have a claim under the Due Process Clause. Under basic rules of party presentation, it's inappropriate for this court to do so. But they were bound by precedent at that point. That's why I wonder whether we should ‑‑ I mean, this seems like a principle of law, and I wonder if we were going to address that, whether we should ask for supplementary briefings. But your argument, I assume, would be no because it's already been ‑‑ I'm out of time. May I go ahead and finish? May. Your Honor, party presentation is important. They could have certainly suggested at any point, including the en banc briefing, that this is an important issue for this court to resolve. At no point was it raised. But certainly it shouldn't be decided with this court without supplemental briefing. Thank you. Thank you. You used all of your time. I'll give you one minute. But I wanted to ask the court. Thank you. I think that Professor has summarized pretty well what I was going to say. But there is one thing remaining. Stere decisis compels controlling authority. Zion applies to this case. Very simple. So we need to follow stere decisis and uphold that very basic principle. Is an officer on notice that if you shoot at a suspect, trained officer, we're talking about reasonable police officer. We're not talking about subjective officer who's scared, 19‑year‑old officer. We're talking about reasonable police officer. Is she on notice that when you shoot four times, the person is already on the ground, are you going to continue shooting or you're going to stop, recess, and see if the threat is going to continue? This man was not a threat. Was not a threat at the time even after the first two shots. The nearest bystander was so far from him. And he was 41 feet from the officer. Thank you.  Thank you very much. Thank you all very much for your oral argument presentations. The case of Estate v. Daniel Hernandez v. the City of Los Angeles is now submitted. And we are adjourned. Thank you very much.
judges: MURGUIA, RAWLINSON, NGUYEN, NELSON, BADE, COLLINS, BRESS, BUMATAY, THOMAS, MENDOZA, JOHNSTONE